UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JILL E. MAREMONT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 10 C 7811 |
| v. | ) |
| | ) Judge Sara L. Ellis |
| SUSAN FREDMAN DESIGN GROUP, LTD. | ) |
| and SUSAN FREDMAN, | ) |
| | ) |
| Defendants. | ) |

# **OPINION AND ORDER**

While Defendants' media marketing director, Plaintiff Jill E. Maremont, was recuperating from an automobile accident, Defendants Susan Fredman Design Group, Ltd. ("SFDG") and Susan Fredman, allegedly accessed Maremont's Twitter and Facebook accounts without her permission and posted to these accounts in her absence. As a result, Maremont filed suit against Defendants alleging violations of the Lanham Act, 15 U.S.C. § 1125(a), the Stored Communications Act (the "SCA"), 18 U.S.C. § 2701 *et seq.*, the Illinois Right of Publicity Act, 765 Ill. Comp. Stat. 1075 *et seq.*, and the common law right to privacy. The Court previously granted summary judgment for Defendants on the Illinois Right of Publicity Act and common law right to privacy claims. Doc. 58. Defendants now seek summary judgment on the remaining federal claims [126]. Because Maremont cannot establish damages under the Lanham Act, the Court grants summary judgment in favor of Defendants on Maremont's Lanham Act claim; however, the Court denies summary judgment on Maremont's SCA claim because Maremont raises genuine issues of material fact that preclude a grant of summary judgment.

# BACKGROUND[1]

SFDG is an interior design firm headquartered in Chicago and owned by Fredman, a licensed interior designer. Susan Rossie was the president of SFDG at all relevant times. Maremont was employed by SFDG as its Director of Marketing, Public Relations, and E-commerce. While in this position, Maremont was not a licensed interior designer and did no interior design work but nonetheless became well known in the Chicago design community. On her LinkedIn page, Maremont described her responsibilities at SFDG to include developing and conducting social media campaigns for SFDG on Facebook and Twitter. Because Maremont's annual compensation included a bonus contingent on SFDG's gross sales exceeding certain threshold levels, her social media efforts were in part intended to increase SFDG's sales so she could qualify for this bonus.

As part of a social media marketing campaign for SFDG, Maremont created a blog titled "Designer Diaries: Tales from the Interior," which was hosted on SFDG's website. Maremont also had Twitter and Facebook accounts for her personal use as well as to promote SFDG. Maremont's Twitter account was in her name, @jmaremont, and by August 2009, had 1,121 followers. Although Fredman states that she directed Maremont to open the Twitter account for SFDG, Maremont denies it. From these social media accounts, Maremont frequently posted links to SFDG's website and the Designer Diaries blog. By posting links to SFDG's website and

---

[1] The facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1. They are taken in the light most favorable to Maremont, the non-movant. The Court has considered the parties' objections to the statements of fact and supporting exhibits and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. The Court notes that although Defendants cite to various exhibits that were used at Maremont's deposition in their statement of facts and response to Maremont's statement of additional facts, these exhibits were filed in connection with Defendants' previous motion for summary judgment, Doc. 39, and not this summary judgment motion.

blog, Maremont intended to increase SFDG's visibility on the internet, increase its gross sales, and, ultimately, add to her bonus.

Maremont created a Facebook page for SFDG at Fredman's request. Maremont opened SFDG's Facebook page through her personal Facebook account on February 17, 2009. In order to administer SFDG's page, the page administrator had to log on through his or her personal Facebook account. At the time she created the SFDG page, Maremont testified that she listed herself and Fredman as the administrators, and later, after Rossie opened a Facebook account, added Rossie as an administrator as well. Fredman and Rossie deny knowing of their administrator status, and Olivia Belmonti (née Flink-Larsen), who replaced Maremont, states that Maremont was the only administrator and thus in order to make any changes to the SFDG Facebook page, she was required to first log into Maremont's personal Facebook account.

To keep track of the various social media campaigns she was conducting for SFDG, Maremont created an electronic spreadsheet in which she stored all account access information, including the passwords for her Twitter and Facebook accounts. This spreadsheet was created on an SFDG-owned computer and saved on the SFDG server. Although Maremont denies providing the spreadsheet to anyone and maintains that the electronic file folder containing the spreadsheet was locked, Laurice Shelven, an intern at SFDG from September 8, 2009 to December 30, 2009, states that Maremont provided her with the spreadsheet so she could assist Maremont in composing and publishing posts for the various SFDG social media campaigns. Belmonti states that when she replaced Maremont, she found the spreadsheet printed in a folder on Maremont's desk and could also access it electronically.

On September 15, 2009, Maremont and an SFDG co-worker were seriously injured in an automobile accident while on a work-related errand. Maremont suffered serious brain trauma

and still suffers from post-concussion syndrome and post-traumatic stress disorder. After Maremont's accident, SFDG hired Belmonti on a temporary basis to conduct its social media campaigns in Maremont's absence. Belmonti and Shelven used the access information provided on the spreadsheet to access and continue the various social media campaigns Maremont had set up for SFDG.

Specifically, Defendants made seventeen posts to Maremont's Twitter account during her absence from SFDG. The first post, on September 21, 2009, linked to an SFDG blog written by Fredman explaining Maremont's accident and announcing that, during her absence, Belmonti would assume Maremont's role as a guest blogger. The remaining tweets promoted SFDG and in some cases provided links to SFDG's blog or website.

At the same time, between September 23 and November 24, 2009, while Maremont maintains she was not accessing her Facebook page, five friend requests were accepted on her personal Facebook page. Additionally, on December 2, 2009, despite Maremont's insistence that she did not post anything to her Facebook page since the accident, a Facebook friend of hers posted "Good to see you sending facebook notices again Jill." Ex. D to Maremont Declaration at 48. Maremont, however, cannot identify any posts on her personal Facebook page that were made by Defendants, and it is unknown who accepted the friend requests on Maremont's behalf. Although Maremont's husband, Michael, admits to posting an update on Maremont's Facebook page under her name, he denies accepting any Facebook friend requests on her account. Fredman has denied accessing Maremont's personal Facebook page. Rossie has denied posting to or friending anyone on Maremont's personal Facebook page. Belmonti admits to accessing Maremont's personal Facebook page in order to access SFDG's Facebook page but denies that she or Shelven ever posted to or friended anyone on Maremont's personal Facebook page.

Belmonti also states that, to her knowledge, no one at SFDG aside from Shelven and herself accessed Maremont's Twitter and Facebook accounts. Shelven states that "[a]t no time did I access or post on facebook pages outside of the accounts listed on the 'Social Media Campaigns' spreadsheet, and occasionally my own," and "[a]t no time did I access or 'friend' anyone on any facebook page outside of the accounts listed on the 'Social Media Campaigns' spreadsheet, and occasionally my own." Ex. VII to Defs.' Mot. Summ. J., Declaration of Laurice Shelven ¶¶ 12–13.

Despite knowing Belmonti was acting as her temporary replacement, Maremont did not contact Belmonti to ask her to stop making Twitter or Facebook posts on Maremont's accounts. Maremont states that she told Fredman and Rossie that they were not authorized to access her personal Twitter and Facebook accounts and to stop posting updates to those accounts, but Fredman and Rossie deny that Maremont made any such requests. Ultimately, on December 11, 2009, Maremont and her husband changed the passwords to her Twitter and Facebook accounts. Thereafter, Defendants did not make any additional posts to these accounts.

On May 17, 2010, Maremont returned to work at SFDG on a part-time basis. On May 18, 2010, Maremont wrote Twitter and Facebook posts that linked to a May 17, 2010 entry on SFDG's blog in which she announced "Your Editor is Back!" In these posts, Maremont thanked her temporary replacements, Belmonti and Michelle Doorman, for their posts on the blog in her absence. Maremont's return to work was short-lived, however, as her doctor recommended that she stop work completely on June 1, 2010, due to the continued presence of her post-concussion syndrome symptoms. Maremont followed her doctor's recommendations and stopped working at SFDG.

On December 10, 2010, Maremont filed this lawsuit. On February 28, 2011, she sent a letter by certified mail to Rossie, announcing her intention to return to work part-time at SFDG on March 17, 2011. On March 8, 2011, SFDG's lawyer responded by letter to Maremont's attorneys advising them that SFDG had filled Maremont's position after her father had directed SFDG employees not to contact Maremont under any circumstances. By March 17, 2011, a public relations firm, Jo Chicago, had hired Maremont.

Maremont claims that Defendants' use of her Twitter and Facebook accounts has caused her emotional distress requiring psychiatric treatment and medication.[2] She states she has recurring nightmares involving Fredman, which interfere with her sleep and affect her daily activities, and that she feels physically ill when Fredman's name is mentioned. Maremont's husband and father corroborate that Maremont becomes emotionally upset at the mention of SFDG or Fredman.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the

---

[2] In her Local Rule 56.1 Statement of Additional Facts, Maremont relies in part on notes taken by her psychiatrist, Dr. Lee S. Schwartz. Dr. Schwartz has not provided a declaration or an expert report and has not been deposed. The Court has not considered his notes in addressing this motion for summary judgment.

evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

### I. Lanham Act Claim

Maremont's false endorsement claim involves "false representations concerning the origin, association or endorsement of goods or services through the wrongful use of another's distinctive mark, name, trade dress or other device." *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.*, 9 F.3d 561, 575 (7th Cir. 1993). "False endorsement occurs when a person's identity is connected with a product or service in such a way that consumers are likely to be misled about that person's sponsorship or approval of the product or service." *Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 880 (E.D. Wis. 2009), *aff'd*, 623 F.3d 436 (7th Cir. 2010).

Defendants argue that Maremont does not have standing to bring her false endorsement claim. This argument was previously rejected by the Court, Doc. 58 at 7–8, but Defendants argue that the Court must reconsider this decision because the findings of fact in that opinion are not binding on the Court here, *see* Doc. 125 ("[F]acts deemed admitted for purposes of any previously-filed summary judgment motion will not be deemed admitted, on that basis alone, with regard to any later-filed summary judgment motion."). As the Court stated in its prior summary judgment opinion, it deemed certain facts admitted based on Defendants' failure to respond to Maremont's Local Rule 56.1 Statement of Additional Facts. Doc. 58 at 3. Thus,

7

reconsideration of the standing inquiry is appropriate here based on the more fully developed record.  *See also* Fed. R. Civ. P. 54(b) (the Court may revise its decisions at any time prior to the entry of a final judgment).  Nonetheless, even based on this more fully developed record, viewing the facts in the light most favorable to Maremont, the Court adheres to its prior finding that Maremont has standing to pursue her Lanham Act claim.

"[S]tanding to assert a [Lanham Act] claim is limited to a 'purely commercial class of plaintiffs.'"  *Stayart*, 623 F.3d at 438 (quoting *Berni v. Int'l Gourmet Rests. of Am., Inc.*, 838 F.2d 642, 648 (2d Cir. 1988)).  Thus, a reasonable jury must be able to conclude from the facts in the record that Maremont has a "commercial interest to protect." *Id.*  Although contested by Defendants, Maremont alleges that she created her Twitter and Facebook accounts for her own economic benefit, knowing that if she left her employment at SFDG, she could promote another employer to her Twitter and Facebook followers.  This following has, in the internet age, become a marketable commercial interest.  *See* Zoe Argento, *Whose Social Network Account? A Trade Secret Approach to Allocating Rights*, 19 Mich. Telecomm. & Tech. L. Rev. 201, 221 (2013) ("A social network account not only serves the worker's interest by facilitating contact with her network, but also helps the worker to build her reputation and market herself to potential employers.  Specifically, the social network account helps the worker to develop her 'personal brand'--the combination of her online image, reputation, and network.").  Maremont is not just asserting a personal interest, like the plaintiff in *Stayart* or *Nieman*.  *Cf. Stayart*, 623 F.3d at 438–39 (plaintiff lacked standing where charitable activities she undertook could not be equated with a commercial interest in protecting her name); *Nieman v. Versuslaw, Inc.*, No. 12-3104, 2012 WL 3201931, at *5 (C.D. Ill. Aug. 3, 2012) (plaintiff lacked standing to bring Lanham Act claim because "Plaintiff's individual reputation in the insurance industry is not the commercial interest

the Lanham Act seeks to protect"). Nor is she claiming standing solely because she is known to her Facebook friends or Twitter followers generally. *Cf. Cohen v. Facebook, Inc.*, 798 F. Supp. 2d 1090, 1098 (N.D. Cal. 2011) (dismissing false endorsement claim where plaintiffs' only suggestion of a protectable economic interest was that they "are known to their own Facebook friends," which "does not rise to the level necessary to invoke the Lanham Act's protection for identities that are 'akin to a trademark'"). Moreover, her interest is not merely hypothetical, as she was actively using her Twitter and Facebook accounts—opened in her name—to promote SFDG. *Cf. Dovenmuehle v. Gilldorn Mortg. Midwest Corp.*, 871 F.2d 697, 700 (7th Cir. 1989) (plaintiffs did not have standing to pursue Lanham Act claim where they did not engage in or claim any present intention to operate a commercial activity under their family name); *Stanfield v. Osborne Indus., Inc.*, 52 F.3d 867, 873 (10th Cir. 1995) ("[T]he mere potential of commercial interest in one's family name is insufficient to confer standing."). Although Defendants have presented evidence that Maremont's interest was tied to that of SFDG and thus cannot confer standing, this is a disputed issue that must be left for the jury's determination.

Defendants also argue that they did not violate the Lanham Act because, as the Court understands it, the Twitter account was associated with SFDG, and not Maremont. Thus, according to Defendants, after they made the Twitter post linking to Fredman's blog entry that described Maremont's injury and Belmonti's role as her temporary replacement, no one could have been misled as to the origin of the subject Twitter posts. But Defendants' initial premise is faulty; the Twitter account was in Maremont's name, not SFDG's, and it would be reasonable to conclude that posts made on that account were made by Maremont herself. Defendants did not change the name of the Twitter account during Maremont's absence and, indeed, even used the first person in one Tweet made from Maremont's account. *See* Ex. II-A to Defs.' Mot. Summ. J.

9

at 5 ("So many design pubs are closing their doors, so I love the premiere issue of Lonny magazine!"). When viewed in the light most favorable to Maremont, a jury could find from the evidence in the record that Defendants committed a Lanham Act violation.

Finally, Defendants argue that summary judgment is warranted on the false endorsement claim because Maremont has submitted no proof of cognizable damages. "In order to recover damages for a purported Lanham Act violation, the plaintiff 'must demonstrate that [she] has been damaged by actual consumer reliance on the misleading statements.'" *L.S. Heath & Son, Inc.*, 9 F.3d at 575 (quoting *Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1205 (7th Cir. 1990)). Maremont must show that she "suffered actual injury, *i.e.,* a loss of sales, profits, or present value (goodwill)," *Web Printing*, 906 F.2d at 1205, or that Defendants were unjustly enriched, *Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1157 (7th Cir. 1994).

At her deposition, Maremont denied suffering any financial injury from Defendants' acts of accessing her Facebook and Twitter accounts and posting to her Twitter account, admitting that "the sum and substance of [her] damages claim in this case is confined to [her] mental distress." Ex. III to Defs.' Mot. Summ. J., Maremont Dep. 161:20–162:8. She now does not dispute that she cannot recover for mental distress if she prevails on her Lanham Act claim but instead argues that she is entitled to a portion of SFDG's gross sales for the period during which Defendants accessed and posted to her Twitter and Facebook accounts. Maremont never disclosed this claimed basis of recovery during discovery and, in fact, disclaimed seeking anything other than damages for mental distress in her deposition. *See id.* She cannot now belatedly seek a portion of Defendants' profits by submitting a declaration setting forth her own calculations of how much she believes she is entitled, well after the close of discovery. *See Tech. Sourcing, Inc. v. Griffin*, No. 10 C 4959, 2013 WL 1828750, at *1 (N.D. Ill. Apr. 30, 2013)

(striking affidavit regarding damages where plaintiff made noncommittal responses in deposition regarding damages and then only executed affidavit regarding damages six months after the close of discovery and on the date on which plaintiff's response to defendant's motion for summary judgment was due); *Park W. Galleries, Inc. v. Global Fine Art Registry, LLC*, No. 2:08-CV-12247, 2:08-CV-12274, 2010 WL 987772, at *6 (E.D. Mich. Mar. 12, 2010) (allowing defendants to seek only those damages disclosed during discovery, finding that the failure to disclose damages sought in pre-trial order was not substantially justified or harmless). The Court thus strikes those portions of Maremont's statement of additional facts and declaration related to financial injury.[3] With no financial information properly before the Court, there is no basis from which to award Maremont any recovery if she succeeded in proving her Lanham Act claim. *See Badger Meter, Inc.*, 13 F.3d at 1157–58 (recovery under § 1117 "must constitute 'compensation' for [the plaintiff's] own losses or for the defendant's unjust enrichment; section 1117(a) (unlike section 1117(b)) does not allow a 'penalty' against the defendant.'"). Therefore, the Court grants Defendants' summary judgment motion as to Count I of the second amended complaint.

## II.  SCA Claim

Under her SCA claim, Maremont alleges that, without permission or authorization, Defendants used her personal Twitter password to access her Twitter account and author seventeen Tweets and similarly used her personal Facebook password to access her personal Facebook account. The SCA was enacted "to protect privacy interests in personal and proprietary information from the mounting threat of computer hackers 'deliberately gaining access to, and sometimes tampering with, electronic or wire communications' by means of

---

[3] The Court also notes that there are various evidentiary issues surrounding Maremont's submission regarding monetary damages, including that the financial statements she has attached to her declaration, as presented, are hearsay and Maremont has not properly provided the Court with the information required to allow it to find that they would fall within the business records exception to the hearsay rule. *See* Fed. R. Evid. 803(6).

electronic trespass." *Devine v. Kapasi*, 729 F. Supp. 2d 1024, 1026 (N.D. Ill. 2010) (citation omitted). The SCA provides a private cause of action for unauthorized, intentional access to communications held in electronic storage. *See Shlahtichman v. 1-800 Contacts, Inc.*, 615 F.3d 794, 803 (7th Cir. 2010). Specifically, the SCA provision at issue states that whoever "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility" and by doing so "obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system" violates the SCA. 18 U.S.C. § 2701(a); *Shefts v. Petrakis*, 758 F. Supp. 2d 620, 635 (C.D. Ill. 2010).

Defendants first argue that there is no admissible evidence that they violated the SCA. But Defendants admit that they accessed Maremont's Facebook account and posted Tweets to Maremont's Twitter account. The parties dispute whether Defendants' actions were authorized or exceeded the scope of Maremont's authorization. Defendants maintain that they had the right to access Maremont's accounts and that she had provided them with the passwords, while Maremont contends her password list was kept in a locked folder on SFDG's server, she never gave anyone authorization to access her accounts, and that she specifically instructed Fredman and Rossie on several occasions after her injury not to access her Twitter or Facebook accounts. Such a dispute, however, cannot be resolved on summary judgment and must be left for the trier of fact.

Next, Defendants argue that Maremont's SCA claim fails because she cannot establish actual damages. The SCA's damages provision provides that "[t]he court may assess as damages in a civil action under this section the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, but in no case shall a person entitled to

12

recover receive less than the sum of $1,000." 18 U.S.C. § 2707(c). This Court previously noted that, in order to recover statutory damages, Maremont must first prove actual damages. Doc. 58 at 10 (citing *Van Alstyne v. Elec. Scriptorium, Ltd.*, 560 F.3d 199, 205 (4th Cir. 2009); *Cornerstone Consultants, Inc. v. Production Input Solutions, LLC*, 789 F. Supp. 2d 1029, 1043 (N.D. Iowa 2011)). The *Van Alstyne* court based its interpretation of § 2707(c) on the Supreme Court's decision in *Doe v. Chao*, 540 U.S. 614, 124 S. Ct. 1204, 157 L. Ed. 2d 1122 (2004), which interpreted what the Fourth Circuit described as a "substantively identical" damages provision in the Privacy Act to conclude that actual damages must be established before statutory damages are recoverable. *Van Alstyne*, 560 F.3d at 204–06; *see Doe*, 540 U.S. at 620–23.

Maremont asks the Court to reconsider, citing to several cases from this and other districts that have not required a plaintiff to prove actual damages in order to recover the minimum statutory damages. *See, e.g.*, *Cedar Hill Assocs., Inc. v. Paget*, No. 04 C 0557, 2005 WL 3430562, at *3 (N.D. Ill. Dec. 9, 2005). These courts have concluded that *Doe* does not control the interpretation of the SCA's damages provision, particularly as the Supreme Court in *Doe* "distinguished the SCA as irrelevant to the interpretation of the Privacy Act when it rejected the plaintiff[']s attempt to analogize the two in support of his argument that the Privacy Act authorized liquidated damages remedies similarly to the SCA." *Shefts v. Petrakis*, 931 F. Supp. 2d 916, 917 (C.D. Ill. 2013); *see also Doe*, 540 U.S. at 626 ("[T]he trouble with Doe's position is its reliance on the legislative histories of completely separate statutes passed well after the Privacy Act."); *id.* at 639–40 (Ginsburg, J., dissenting) (SCA damages provision has "been understood to permit recovery of the $1,000 statutory minimum despite the absence of proven actual damages"); *Chadha v. Chopra*, No. 12 C 4204, 2012 WL 6044701, at *3 n.3 (N.D. Ill. Dec. 5, 2012) ("Though the Supreme Court held that the Privacy Act's virtually identical

13

language did require actual damages, it also arguably assumed that the SCA *did not* require actual damages in order to recover statutory damages.").

Having thoroughly examined the issue and in light of the most recent decision from the Central District of Illinois on the issue, the Court agrees with Maremont and those courts that have held that a plaintiff need not prove actual damages in order to be entitled to statutory damages for an SCA violation. *See Cedar Hill Assocs., Inc.* 2005 WL 3430562, at *3; *Shefts*, 931 F. Supp. 2d at 917; *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 759 F. Supp. 2d 417, 428 (S.D.N.Y. 2010); *Cardinal Health 414, Inc. v. Adams*, 582 F. Supp. 2d 967, 975–76 (M.D. Tenn. 2008); *Freedman v. Town of Fairfield*, No. 3:03CV01048 (PCD), 2006 WL 2684347, at *3 (D. Conn. Sept. 19, 2006); *In re Hawaiian Airlines, Inc.*, 355 B.R. 225, 231 (D. Haw. 2006); *see generally* Kory R. Watson, *Unauthorized Access to Web-Based E-Mail: Recovery Under the Stored Communications Act After* Van Alstyne v. Electronic Scriptorium Ltd., 560 F.3d 199 (4th Cir. 2009), 35 S. Ill. U. L.J. 543 (2011). Like those courts, this Court does not find *Doe* to be controlling or the statutory language of § 2707(c) to be unambiguous, as the *Van Alstyne* court held. *Shefts*, 931 F. Supp. 2d at 918 ("Simply put, *Doe* does not apply to the case at hand."); Watson, *supra*, at 562–65. Unlike the Privacy Act damages provision, which includes restrictive language that "seems to dictate actual damages as the only remedy in that clause," § 2707(c) uses permissive language—that the Court "may assess as damages" actual damages and profits—which "seems to offer [the actual damages] formula as one means of calculation" but not to the exclusion of statutory damages. *Shefts*, 931 F. Supp. 2d at 918. Additionally, unlike the Privacy Act's legislative history, which specifically indicates an intent to exclude statutory damages without actual damages, *see Doe*, 540 U.S. at 622–23, the SCA's legislative history "underscores that the damage that the [SCA] seeks to prevent is an invasion of

14

privacy, not merely instances where a transgressor capitalizes on such an invasion," *Cedar Hills Assocs., Inc.*, 2005 WL 3430562, at *2. Thus, if Maremont is able to establish an SCA violation, she need not prove actual damages in order to be entitled to the minimum statutory damages provided by § 2707(c).

Even if the Court were to find otherwise, however, summary judgment still would not be warranted. First, Maremont has submitted evidence that she suffered emotional distress as a result of Defendants' alleged SCA violations. Defendants argue that there is no evidence to distinguish her claimed emotional distress from the post-traumatic stress and post-concussion symptoms arising from the September 15, 2009 accident. Although Maremont has not submitted any expert testimony on the issue, she has provided her own declaration in addition to those of her husband and father attesting to their personal observations of Maremont's emotional condition after the events in question. Defendants take issue with these declarations as self-serving and as improper expert testimony. Self-serving statements, where based on personal knowledge, can properly create disputes of material fact. *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (citation omitted) ("[W]e long ago buried–or at least tried to bury–the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.' If based on personal knowledge or firsthand experience, such testimony can be evidence of disputed material facts."); *see also United States v. Funds in the Amount of One Hundred Thousand One Hundred & Twenty Dollars*, 730 F.3d 711, 717 (7th Cir. 2013) ("To reject testimony because it is unsubstantiated and self-serving is to weigh the strength of the evidence or make credibility determinations—tasks belonging to the trier of fact."); *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("Deposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving.");

15

*Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009) ("It is true that uncorroborated, self-serving testimony cannot support a claim if the testimony is based on 'speculation, intuition, or rumor' or is 'inherently implausible.' But testimony based on first-hand experience is none of those things." (quoting *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003))).

Additionally, Maremont's, her father's, and her husband's observations of her mental health before and after the incident in question constitute proper lay opinion testimony. *See* Fed. R. Evid. 701; *Christmas v. City of Chicago*, 691 F. Supp. 2d 811, 821 (N.D. Ill. 2010) (Federal Rule of Evidence 701 allows lay witnesses to "testify about their own perceptions, including the physical and emotional effects of the defendants' alleged conduct"); *Macon v. City of Ft. Wayne*, No. 1:11-CV-119, 2012 WL 3745375, at *8 (N.D. Ind. Aug. 28, 2012) ("Macon may testify about his own perception of his physical and mental health, before and after the incident. This includes recounting any pain, fear, or anxiety he experienced during those times. Similarly, Pastor Gregory can testify as to his observations regarding Macon's alleged emotional distress and his efforts to counsel Macon." (citations omitted)). The Court has not considered any opinions Maremont, her husband, and her father have offered as to what caused Maremont's mental distress, however, for that is improper expert testimony that would not be admissible at trial. *See Macon*, 2012 WL 3745375, at *8 ("No witness, however, shall be permitted to opine that the arrest proximately caused Macon's mental and physical health problems or offer a medical diagnosis of his alleged injuries."). Nonetheless, based on the proffered testimony, a reasonable juror could infer the required causation between the alleged conduct and Maremont's emotional distress. *Id.*; *see also Harms v. Lab. Corp. of Am.*, 155 F. Supp. 2d 891, 899 (N.D. Ill. 2001) (plaintiff's testimony of "her own emotional state, providing she reasonably and

16

sufficiently explains the circumstances of the injury," when "taken with other evidence of the physical effects suffered by plaintiff, may be enough to establish emotional injury"). Thus, because Maremont has submitted sufficient evidence from which a jury could find actual damages, the Court denies summary judgment on the SCA claim on this basis as well.

Alternatively, as the *Van Alstyne* court recognized, and Defendants do not contest, a plaintiff need not prove actual damages to recover punitive damages, attorney's fees, or costs for an SCA violation. *Van Alstyne*, 560 F.3d at 209. Taking the evidence in the light most favorable to Maremont, there is evidence from which a jury could conclude that Defendants acted willfully and intentionally in accessing Maremont's Facebook and Twitter accounts despite her specific instructions to Fredman and Rossie not to do so. Because a jury would thus be entitled to determine whether punitive damages are warranted, summary judgment is not appropriate on the SCA claim on this additional ground.

### III. Illinois Workers Compensation Act Preemption

In their reply brief, Defendants argue for the first time that Maremont's claims are barred by the Illinois Workers Compensation Act ("IWCA"), 820 Ill. Comp. Stat. 305/5(a). The IWCA provides the exclusive remedy for accidental injuries that employees sustain in the course of their employment. *Id.*; *Meerbrey v. Marshall Field & Co.*, 564 N.E.2d 1222, 1225, 139 Ill. 2d 455, 151 Ill. Dec. 560 (1990). But the Court cannot reach Defendants' argument for two reasons.

First, new arguments may not be raised for the first time in reply, as Defendants have done here. *See Multi-Ad Servs., Inc. v. NLRB*, 255 F.3d 363, 370 (7th Cir. 2001) ("It is well-settled that parties may not raise new arguments or present new facts for the first time in reply."). Defendants argue that their IWCA argument is in response to Maremont placing her medical treatment at issue in her response brief. But Defendants mentioned the medical treatment

17

Maremont sought after the accident in their opening memorandum in support of their motion for summary judgment, *see* Doc. 128 at 1.  Further, because this is not Defendants' first attempt at properly presenting this summary judgment motion for the Court's decision, Defendants cannot claim that they were unaware of the arguments Maremont would make in her response.  *See* Doc. 150 at 1–2 (acknowledging that Defendants asserted IWCA preemption in their previously filed replies).  If Defendants wanted the Court to consider the IWCA preemption defense—and Maremont to have the ability to properly respond to that defense—Defendants should have raised it in their opening memorandum instead of in their reply.  *See Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 913 (7th Cir. 2011) ("The underlying concern [behind the waiver rule] is to ensure that the opposing party is not prejudiced by being denied sufficient notice to respond to an argument.").

This, however, is not the only problem with Defendants' belated assertion of the IWCA preemption defense, as it "is an affirmative one . . . [,] which is waived if not asserted by [the employer]."  *Doe v. Lee*, 943 F. Supp. 2d 870, 879–80 (N.D. Ill. 2013) (alteration in original) (quoting *Doyle v. Rhodes*, 461 N.E.2d 382, 386, 101 Ill. 2d 1, 77 Ill. Dec. 759 (1984)).  Defendants never pleaded IWCA preemption nor made a motion to do so and thus an additional basis exists for not addressing it here.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [126] is granted in part and denied in part. Summary judgment is granted for Defendants on Maremont's Lanham Act claim.

Dated: March 3, 2014

SARA L. ELLIS
United States District Judge